IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

Nos. 09-70265, 09-70268, 09-70292, 09-70313, 09-70316,
09-70317 & 09-70640

_____

AVISTA CORP., *et al,*

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

_____

ON PETITION FOR REVIEW UNDER THE
NORTHWEST POWER ACT

_____

**RESPONDENT-INTERVENOR BRIEF OF
PUBLIC UTILITY DISTRICT NO. 1 OF COWLITZ COUNTY,
NORTHWEST REQUIREMENTS UTILITIES,
PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, AND
PACIFIC NORTHWEST GENERATING COOPERATIVE AND
MEMBERS**

Paul M. Murphy
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
Portland, Oregon 97201
Tel: (503) 227-1011
Email: pmurphy@mbllp.com
*Attorney for Cowlitz PUD*

Susan K. Ackerman
621 SW Morrison, Suite 700
Portland, Oregon 97205
Tel: (503) 297-2392
Email: susan@ska-law.com
*Attorney for Northwest Requirements
Utilities*

Additional Counsel Listed on Back of Cover

Anne L. Spangler,
    General Counsel
Eric Lee Christensen,
    Associate General Counsel
Jeffrey R. Kallstrom,
    Senior Counsel
Public Utility District No. 1
of Snohomish County, Washington
PO Box 1107
2320 California Street
Everett, WA 98206-1107
Telephone: (425) 783-8649
Email: elchristensen@snopud.com

*Attorneys for Public Utility District
No. 1 of Snohomish County,
Washington*

R. Erick Johnson
R. ERICK JOHNSON PC
5285 SW Meadows Rd, Ste 230
Lake Oswego, OR 97035
Tel: 503.684.9658
E-mail: ejohnson@rejpc.com

*Attorney for Pacific Northwest
Generating Cooperative and
Members*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Respondent-Intervenors provide the following information:

1. Public Utility District No. 1 of Cowlitz County, Washington, states that it is a government public utility organized under the laws of the state of Washington and has no parent corporation and is not owned in whole or part by any publicly held corporation;

2. Northwest Requirements Utilities (NRU) states that it is a non-profit corporation organized under the laws of the state of Oregon to represent the interests of its fifty utility members. NRU has no parent corporation and is not owned in whole or part by any publicly held corporation; and

3. Public Utility District No. 1 of Snohomish County, Washington, states that it is a government public utility organized under the laws of the state of Washington and has no parent corporation and is not owned in whole or part by any publicly held corporation.

4. Pacific Northwest Generating Cooperative (Oregon); Blachly-Lane County Cooperative Electric Association (Oregon); Central Electric Cooperative, Inc. (Oregon); Clearwater Power Company (Idaho); Consumers Power, Inc. (Oregon); Coos-Curry Electric Cooperative, Inc.

i

(Oregon); Douglas Electric Cooperative (Oregon); Fall River Rural Electric Cooperative, Inc. (Idaho); Lane Electric Cooperative (Oregon); Lost River Electric Cooperative, Inc. (Idaho); Northern Lights, Inc. (Idaho); Okanogan County Electric Cooperative, Inc. (Washington); Raft River Rural Electric Cooperative, Inc. (Idaho); Salmon River Electric Cooperative, Inc. (Idaho); Umatilla Electric Cooperative Association (Oregon); and, West Oregon Electric Cooperative, Inc. (Oregon) **each** states that it is a cooperative corporation organized under the law of the state indicated. **Each of the above** also states that it has no parent corporation and no publicly owned corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ............................................. i

Table of Authorities ................................................................. v

Statement of Jurisdiction ............................................................ 1

Statement of the Issues ............................................................... 1

Statement of Facts ..................................................................... 2

A.     Customers Sought Changes To Their Contracts With BPA ............... 3

B.     Tiered Rates Potentially Furthered Customers' Objectives ................ 5

C.     Tiered Rates And The Regional Dialogue Contracts To Implement
      Them Presented Complex Practical Problems ................................. 10

Summary of Argument ................................................................ 12

Argument ................................................................................ 14

I.      TIERED RATES ARE PERMITTED BUT NOT REQUIRED BY
      THE NWPA ........................................................................ 14

II.     BPA MAY LAWFULLY CONDITION AN OPTIONAL BENEFIT
      ON THE WAIVER OF STATUTORY RIGHTS ............................. 15

III.    THE NWPA LIMITS BILLING CREDITS TO ZERO IN A
      TIERED RATE ENVIRONMENT ..................................................... 17

IV.    A WAIVER OF THE RIGHT TO EXCHANGE NEW
      RESOURCE COSTS DOES NOT CONFLICT WITH ANY
      PURPOSE OR PROVISION OF THE NWPA ................................ 20

V.     GRAYS HARBOR'S VOLUNTARY WAIVER OF RIGHTS IN ITS
      TIERED RATE CONTRACT IS CONSISTENT WITH THIS

COURT'S DECISIONS IN *PORTLAND GENERAL ELECTRIC* AND
*GOLDEN NORTHWEST ALUMINUM* …………………………..23

Conclusion ...................................................................................................... 25

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE WITH RULE 32

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.,*
   *126 F.3d 1158* (9th Cir. 1997)...................................................... 14, 25

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   476 U.S. 837 (1984) .......................................................... 22

*Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.*,
   501 F.3d 1037 (9th Cir. 2007)................................................ 14, 23, 24

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
   501 F.3d 1009 (9th Cir. 2007)......................................... 14, 22, 23, 24

*Sales of Electric Power to the Bonneville Power Administration,*
   *Revisions to Average System Cost Methodology,*
   128 FERC ¶ 61,222 (September 4, 2009) ......................................... 22

**Statues**

16 U.S.C. § 839(1) [NWPA § 2(1)]............................................. 16

16 U.S.C. § 839(2) [NWPA § 2(2)]............................................. 16

16 U.S.C. § 839c(c) [NWPA § 5(c)] ..................................... *passim*

16 U.S.C. § 839d(h) [NWPA § 6(h)].................................... *passim*

16 U.S.C. § 839e(e) [NWPA § 7(e)] ........................................ 16

**Other Authority**

H. Rep. No. 96-976, Pt. I, 96th Cong., 2d Sess. (1980) ............................... 21

H. Rep. No. 96-976, Pt. II, 96th Cong., 2d Sess. (1980) .............................. 21

## Statement of Jurisdiction

Public Utility District No. 1 of Cowlitz County, Washington (Cowlitz PUD), Northwest Requirements Utilities (NRU), Public Utility District No. 1 of Snohomish County, Washington (Snohomish PUD), and Pacific Northwest Generating Cooperative and its Members (PNGC) (jointly the "Intervenor Public Utilities"[1]) adopt the Statement of Jurisdiction of Respondent, the Bonneville Power Administration (BPA).

## Statement of the Issues

1.     Whether Petitioner Public Utility District No. 1 of Grays Harbor (Grays Harbor) voluntarily agreed to waive certain options available to it under the Pacific Northwest Electric Power Planning and Conservation Act (NWPA) in return for receiving power from BPA at "Tiered Rates," which provide consumer-owned utilities like Grays Harbor with access to power from existing federal dams and other facilities at significantly lower rates than would be possible if the costs of these existing resources were melded with the higher costs of new resources, as under traditional BPA rates.

---

[1] The Intervenor Public Utilities adopt and support the additional Intervenor-Respondent brief filed in this matter by the Public Power Council.

2.      Whether the NWPA prohibits BPA from offering the "Tiered Rates" option only to customers that agree not to exercise certain options under the NWPA that undermine the fundamental purposes of Tiered Rates.

## Statement of the Facts

The Intervenor Public Utilities adopt BPA's Statement of the Facts and add the following: Cowlitz PUD is a preference customer of BPA and has executed a Regional Dialogue Contract[2] with BPA.  NRU is a non-profit trade association organized under Oregon law to, among other things, represent the interests of fifty preference customers of BPA, all of whom have executed Regional Dialogue Contracts with BPA.  Snohomish PUD is a preference customer of BPA, it is a participant in the residential exchange program established under section 5(c) of the NWPA, 16 U.S.C. § 839c(c), and it has executed a Regional Dialogue Contract with BPA.  PNGC and each of its Members are preference customers of BPA.  PNGC has executed for itself and its Members a Regional Dialogue Contract with BPA.

---

[2] As explained more fully in BPA's brief (BPA Br. 6-18), the Regional Dialogue was a multi-year process in which BPA and its customers defined the appropriate role for BPA in providing for the power needs of the Pacific Northwest in the period after current contracts expire in 2011.  The Regional Dialogue Contracts provide for Tiered Rates and other mechanisms that implement the constructs agreed to in the Regional Dialogue.

## A.  Customers Sought Changes To Their Contracts With BPA.

The Intervenor Public Utilities were active participants in the extensive Regional Dialogue administrative process described by BPA in its Statement of the Facts.  The Regional Dialogue process had as its primary purpose to negotiate a more effective and mutually satisfactory method for BPA and its customers to do business together under the NWPA.  During that administrative process, the Intervenor Public Utilities submitted many written comments and suggestions concerning proposed changes to BPA's manner of doing business. SER 575-80, 1735-61, 1764-5.[3]  Intervenor Public Utilities attended literally hundreds of meetings and workshops with BPA and other interested parties to draft, discuss and negotiate the Regional Dialogue Contracts, the Tiered Rate Methodology, and related documents and policies to implement the evolving Regional Dialogue business plan. Although the parties did not reach complete agreement on all issues, the end product of the Regional Dialogue process, including the Regional Dialogue Contract at issue in this case, received overwhelming support from nearly all of BPA's customers.

---

[3] In this brief, Intervenor Public Utilities rely on those portions of the record contained in BPA's Supplemental Excerpts of Record, which will be cited as SER__.

Prior to BPA's initiation of the Regional Dialogue administrative process, BPA's consumer-owned utility customers ("COUs" or "preference customers") and investor-owned utility customers ("IOUs") approached BPA in 2002 with a concept paper for the "Future Role of the Bonneville Power Administration".  SER 1764-75, 1735-61.  That concept paper articulated several objectives, two of which are particularly relevant to this case.  One objective was to allocate to utility "customers equitable, secure and long-term benefits of the Federal base system (FBS)," which comprises the federally-owned hydroelectric dams in the Columbia River basin and several related generation projects.  SER 1735, 1765. Another objective was "[t]o allocate the cost of procuring power for future load growth to the serving utility."  *Id*.  In other words, BPA's public customers sought fixed rights to an FBS that would not be constantly diluted in value by the added cost of new, more expensive BPA resource acquisitions to meet growing electricity loads in the Pacific Northwest.  The two objectives were echoed in some of the other objectives identified by customers, such as the objective "[t]o reduce BPA's need to augment the FBS and to reduce its role in the wholesale power market as a buyer and seller of power."  SER 1764.

### B.    Tiered Rates Potentially Furthered Customers' Objectives.

Guided by the NWPA, the parties explored several mechanisms to pursue these objectives. As the Regional Dialogue discussions progressed, "tiered rates" became the leading candidate mechanism to obtain the customers' objectives. Under typical ratemaking methods, rates are set to recover the average cost of the generating resources and other equipment needed to supply electric power to serve existing loads and load growth, plus the expenses incurred by the utility (or the wholesale power supplier such as BPA) in providing electric power. Such rates are called "melded rates".

Due to persistent inflation over long periods of time, and the fact that for BPA new resources are by their very nature more expensive than the existing largely hydroelectric resource base, the dollar costs of new resources are almost always higher than the average costs of existing resources, new and old, on a supplier's system. As a result, it is generally cheaper for any utility customer to purchase power from BPA at melded rates than it would be for the same customer to acquire a new resource independently at the actual cost of the resource. Therefore, melded rates discourage BPA's utility customers from developing their own resources.

Of course, if BPA must acquire a resource to serve the utility's request for additional power, BPA must collect the full cost of that resource

5

through its rates (however those rates are established). With melded rates, BPA's average resource cost increases each time it must acquire new, expensive resources to meet load growth. Therefore, only part of the cost of meeting a particular utility's load growth is included in the melded rate paid by that utility to BPA, while the remaining cost is recovered through higher average rates to all of BPA's customers. Thus, melded rates not only discourage independent resource development, they also shift costs from growing utilities to non-growing utilities.

To demonstrate these problems mathematically, assume that BPA had 20 equally sized customers and that its average power cost is $20 per unit of customer load for a total $400. Now assume that one customer seeks to double its load on BPA (increase to two units of load) and that BPA must pay $41 to acquire the additional power to serve the new unit of load. BPA's new total cost is $441, but it is now selling 21 units of power instead of 20, so its average cost is now $21 per unit. So, $21 of the cost of the new resource is recovered from the sale of the new unit of power to the growing customer. The other $20 in new cost is recovered by the extra $1 average cost applied to the 20 units sold before the load growth. The net effect is that the growing customer pays only $22 of the $41 cost of its load growth ($21 for the new unit and a $1 price increase for its old unit) and $19 of that

6

cost is paid by higher rates to the 19 customers whose loads did not grow. The growing customer benefits by placing its load on BPA rather than acquiring the additional $41 power itself.

One aspect of the NWPA at issue in this case, billing credits, is a mechanism to ameliorate the tendency of melded rates to discourage independent resource acquisitions by BPA's customers. Sections 6(h)(1) and 6(h)(1)(B) of the NWPA provide that, if a customer requests a billing credit for developing a resource which reduces BPA's obligation to acquire resources to meet load growth, then BPA must provide a billing credit. 16 U.S.C. §§ 839d(h)(1) and 839d(h)(1)(B). Section 6(h)(4) limits the billing credit to its "net cost actually incurred," that is, the cost of the resource in excess of the amount the customer would have paid to BPA for the power. 16 U.S.C. §§ 839d(h)(4). Section 6(h)(4) further provides that the rate impact on other customers "shall be no greater than the rate impact such customers would have experienced" had BPA acquired the power itself and sold it to the growing customer. *Id.*

In the above example, the growing customer's net cost of the $41 resource is $20, the $41 cost of the new resource less the $21 price that customer would pay to BPA if BPA acquired the new resource. If the growing customer instead acquired the new resource itself, under Section

6(h)(4), then the customer could get a billing credit of $20, and all 20 customers (including the growing customer) would face the same $1 increase in the unit price of their power purchase from BPA. So, at least theoretically, billing credits can ameliorate the disincentive for customers to develop their own resources in a melded rate environment.

As a practical matter, however, billing credits simply have not been effective in carrying out their intended purpose. To start with, it is difficult for customers to recover the full "net cost" of their billing credit resource from BPA while simultaneously allowing BPA to meet the rate impact test of section 6(h)(4).[4] As a result, BPA has rarely been requested to provide billing credits, and, to the best of the Intervenor Public Utilities' knowledge, not at all for the last ten years. In the 29 years since passage of the NWPA, BPA has provided billing credits for only four small resources. Moreover, billing credits do nothing to ameliorate customer concerns regarding the shifting of costs from customers with load growth to other customers.

Tiered rates, on the other hand, can eliminate both the incentive against resource development of melded rates and protect all customers from upward BPA rate pressure. Under tiered rates, BPA offers each customer a

---

[4] This occurs because long-lived resources almost always have high early year costs, and BPA's alternative acquisition would normally be a lower-priced market purchase.

known amount of power based on the average costs of BPA's existing resources. This price is known as the Tier 1 rate. If the customer wants more power from BPA than its allocated share of the output from BPA's existing resources (known as the customer's "High Water Mark" or "HWM"), then the customer must pay BPA a rate, known as a Tier 2 rate, based on BPA's cost of acquiring the resource needed to serve the additional load. By requiring the customer to pay a Tier 2 rate for power above the customer's HWM, tiered rates eliminate the resource-development disincentive because, at any given time, the Tier 2 rate is likely to be very close to the cost of a customer developing its own resource. Tiered rates also insulate other customers from the upward rate pressure from other customers' load growth. A customer will choose whether to place its load growth on BPA or develop its own resources independent of any assumption that the purchase from BPA will be subsidized by higher rates to other customers. Moreover, whatever the customer decides in terms of load growth service, all of BPA's customers are assured that they will not have to help pay for the decision.

As the Regional Dialogue process progressed, the discussions among the parties made clear that many utilities would seek greater independence from BPA and develop their own resources if the resource-development

9

disincentive of melded rates were effectively removed. This fact meant that customers that chose to place their future load growth on BPA would also benefit from tiered rates. They would be relieved of any upward pressure on BPA rates that would have occurred had the resource development-minded utilities continued to be bound to BPA by the resource-development disincentive of melded rates. In short, tiered rates and the Regional Dialogue Contracts needed to implement such rates promised substantial benefits and greater equity to all of BPA's customers. Even though BPA offered to provide customers that preferred to continue to take service at melded rates a melded rate contract (SER 403),[5] not a single customer – notably including Grays Harbor – selected that option.

> **C.    Tiered Rates And The Regional Dialogue Contracts To Implement Them Presented Complex Practical Problems.**

While tiered rates offer significant benefits to BPA's customers, their implementation required parties to work through many complicated details. Such details included determining exactly how the rates would work in practice and what contract terms would be required to give customers the flexibility needed to develop resources while providing BPA sufficient

---

[5] Intervenor Public Utilities refer to a traditional BPA power sales contract, under which a customer such as Grays Harbor could purchase power at a traditional BPA melded rate, as a "melded rate contract" for purposes of distinguishing it from BPA's Regional Dialogue "Tiered Rates Contracts".

notice of what loads it would be required to serve. It is almost certain that all of the parties to the Regional Dialogue process, including BPA and its customers, seriously underestimated the complexity of the task they had taken on.

As the Regional Dialogue process unfolded, many customers expressed concern that it might not be possible to develop a workable tiered rate/contract combination that would treat them fairly. Many customers in many meetings and workshops sought assurances that, if tiered rates and the Regional Dialogue Contracts to implement them were ultimately unacceptable to them, then BPA would offer them a contract arrangement not based on tiered rates. Some customers also urged BPA to develop such alternative contracts in parallel with the Regional Dialogue Contracts.

BPA repeatedly assured customers that it would develop an alternative contractual arrangement if the Regional Dialogue Contracts based on tiered rates were not acceptable to them. These same assurances were reiterated in the Regional Dialogue Contact ROD. SER 403. However, BPA declined to initiate work on any such contracts until after it completed work on the Regional Dialogue Contracts. BPA pointed out that many customers had already complained that the work load in BPA's Regional Dialogue process was stretching their resources to the breaking

11

point.  The Intervenor Public Utilities can attest to the stress placed on their resources to complete the Regional Dialogue Contracts in time to allow customers to prepare for anticipated growth in demand for electricity.  BPA also stressed that it was much more important to focus on "getting tiered rates and the Regional Dialogue Contracts right" than to divert attention to the possibility that some small number of customers might find the Regional Dialogue Contracts unacceptable.  Hindsight demonstrates the wisdom of focusing attention on the Regional Dialogue Contracts instead of diverting resources to simultaneously develop a fall-back contract.  Every single customer eligible to execute a Regional Dialogue Contract has done so, and not one customer has requested an alternative melded-rate contract.

## Summary of Argument

If BPA were precluded by the NWPA from having tiered rates, then the Regional Dialogue Contracts that are based on tiered rates would be invalid.  Neither Grays Harbor nor any other petitioner contests the lawfulness of tiered rates. GH Br. at 31.  Neither Grays Harbor nor any other petitioner contends that tiered rates are mandatory.  *Id.* at 26.  These factors should govern this Court's decision here.

Grays Harbor argues that it was forced to give up statutory rights involuntarily.  In fact, Grays Harbor's actions demonstrate that Grays

12

Harbor voluntarily agreed to waive certain options it had under the NWPA in order to enter into a Regional Dialogue Contract, even though Grays Harbor could, if it wanted, enter into a contract without tiered rates and without waiving its options under the NWPA. Nothing in the law precludes Grays Harbor from agreeing to waive statutory rights as a condition to getting contract terms that BPA had the legal authority but was not required to offer, nor does any law preclude BPA from requesting and accepting such waiver. *See* BPA Br. at 43-44.

Nor is Grays Harbor's waiver of billing credits inconsistent with the NWPA. On the contrary, in the context of tiered rates, billing credits have no value and Grays Harbor's waiver of those statutory rights in that context is therefore consistent with the NWPA.

Similarly, Grays Harbor's claim that the Regional Dialogue Contracts violate the Residential Exchange provisions contained in Section 5(c) of the NWPA is without merit. In fact, BPA carefully constructed the waiver provision to make clear that those utilities who executed a Regional Dialogue Contract would only be required to waive their ability to exchange resources not dedicated to that customer's load as of September 30, 2006. By that time, BPA customers were fully informed of the direction the

Regional Dialogue was taking and knew that resources dedicated after that date might not be eligible for the Residential Exchange.

Grays Harbor attempts to equate the partial waiver in the Regional Dialogue Contracts to the REP Settlement Agreement found to be unlawful in *Portland Gen. Elec. v. BPA,* 501 F.3d 1009 (9th Cir. 2007) and its companion case, *Golden Northwest Aluminum v. BPA,* 501 F.3d 1037 (9th Cir. 2007). But those cases are distinguishable because they did not involve a voluntary waiver of statutory rights. They are also distinguishable because the BPA actions challenged there conflicted with express requirements, intent, and purposes of the NWPA. In this case, BPA adopted a more effective mechanism to carry out the expressed purposes of the NWPA, and nothing in the NWPA precludes BPA from adopting this mechanism. In such circumstances, as this Court has determined, BPA can implement such a mechanism based on BPA's reasonable determination that to do so furthered the purposes of the NWPA. *Ass'n of Pub. Agency Customers v. BPA,* 126 F.3d 1158, 1169-70 (9th Cir. 1997).

## Argument

## I. TIERED RATES ARE PERMITTED BUT NOT REQUIRED BY THE NWPA.

For the purposes of this case, the Court should assume that tiered rates are lawful but not required by the NWPA. Grays Harbor does not contend

that tiered rates are contrary to the NWPA. GH Br. at 31. Nor does any other petitioner. It is also a fact that no party has argued that tiered rates are mandatory. Thus, the Court should evaluate Grays Harbor's argument assuming that tiered rates are lawful but not required.

## II.  BPA MAY LAWFULLY CONDITION AN OPTIONAL BENEFIT ON THE WAIVER OF STATUTORY RIGHTS.

Tiered rates have obvious benefits for BPA's customers. They allow customers to retain access to their *pro rata* share of BPA's existing low-cost resources; they incentivize cost-effective conservation; they reduce the inevitable upward pressure on BPA's rates created by the need for BPA to develop new resources; and they eliminate the disincentive caused by melded rates for customers to independently develop resources. It should be no surprise that every single eligible customer entered into a Regional Dialogue Contract predicated on tiered rates.

Grays Harbor claims that, because the NWPA includes billing credits as one means of addressing the costs of new resources, using tiered rates to encourage non-BPA resource development in the Pacific Northwest "conflicts" with the NWPA. GH Br. at 31. As BPA correctly points out in response, billing credits are a means to an end, not an end in themselves. BPA Br. at 34. Billing credits are one of many tools available to BPA to achieve three of the express purposes of the NWPA: "to encourage …

15

(A) conservation and efficiency in the use of electric power, and (B) the development of renewable resources within the Pacific Northwest" and "to assure the Pacific Northwest of an adequate, efficient economic and reliable power supply." 16 U.S.C. §§ 839(1) and 839(2) (NWPA sections 2(1) and 2(2)). Another tool the NWPA provided BPA to achieve these same purposes is considerable rate design flexibility. 16 U.S.C. § 839e(e) ("Nothing in this chapter prohibits the Administrator from establishing […] time-of-day, seasonal rates, or other rate forms.").

BPA made the reasonable judgment that tiered rates could do much more than billing credits to further these purposes, and that allowing customers paying tiered rates to claim billing credits for generating resources was inconsistent with tiered rates. *See* Section III *infra*. BPA's experience with billing credits showed them to be largely ineffective to carry out the purposes of the Act. BPA's decision to offer to use the more effective of two mutually exclusive but statutorily allowed tools to further the stated purposed of the NWPA does not conflict with the NWPA.

Nor is there any conflict with the NWPA for Grays Harbor to agree to forego requesting billing credits in order to obtain tiered rates. Grays Harbor's claim that BPA forced it to waive the statutory option to request billing credits is simply incorrect. BPA repeatedly assured customers that

16

customers who did not elect tiered rates would be offered a melded rate

contract that did not preclude billing credits. SER 378; 403. Given these

assurances, the only reasonable inference that can be drawn from the fact

that Grays Harbor signed a Regional Dialogue Contract providing for tiered

rates is that Grays Harbor preferred tiered rates to billing credits.

Grays Harbor now seeks to retain the benefit of tiered rates while

asking this Court to relieve it of a condition precedent to those tiered rates.

This request is wholly unwarranted. To this day, BPA holds open the option

for Grays Harbor to elect billing credits over tiered rates. BPA Br. at 43 n.6.

If Grays Harbor believes, incorrectly, that it may not lawfully waive the

option of billing credits or that billing credits are more valuable than tiered

rates, it should take up BPA's offer of a melded rate contract that does not

contain the billing credit waiver.

## III.  UNDER TIERED RATES, THE NWPA LIMITS BILLING CREDITS TO ZERO.

Contrary to Grays Harbor's implicit contention, the waiver of billing

credits has no practical consequences for a customer that receives service

under a Regional Dialogue Contract at tiered rates. The Regional Dialogue

Contracts provide that customers may purchase sufficient power from BPA

at a Tier 1 rate to meet their Contract High Water Mark, which is calculated

based upon each customer's existing load. SER 25, 206 (Regional Dialogue

Contract, Section 3.2). Because billing credits only apply where a customer is building new resources to meet growing electricity demand, billing credits would apply only to power that a customer would otherwise purchase from BPA at a Tier 2 rate, which is the rate available for customers to serve load above their individual Contract High Water Mark.

By definition, BPA's Tier 2 rates are to be established to recover the full cost of serving new loads in order to prevent customers with growing loads from shifting their costs to other customers. Once a customer has agreed to take service at tiered rates, section 6(h)(4) of the NWPA effectively precludes BPA from providing billing credits for subsequently developed customer resources. 16 U.S.C. § 839d(h)(4). This result flows directly from the "net cost" and "rate impact limits" on billing credits in NWPA section 6(h)(4). *Id.*

First, the Tier 2 rate will be based on incremental resource costs, and will therefore differ little, if any, from the cost of the resource a customer might develop on its own. Section 6(h)(4) provides that "[f]or resources other than conservation, the customer shall be credited for *net cost* actually incurred by such customer. . . in acquiring, constructing, or operating the resource for which the credit is granted." *Id.* (emph. added). So, building on the example used in the Statement of Facts, if a customer were to develop a

$41 resource and BPA's Tier 2 rate were $41, then the net cost to such customer within the meaning of section 6(h)(4) would be zero. In any case, the differences between the Tier 2 rate and the customer's costs are likely to be small or non-existent, so the "net cost" of the resource under section 6(h)(4), which caps the maximum billing credit permitted, will always be zero or close to zero.

More importantly, section 6(h)(4) provides that "[t]he rate impact to the Administrator's other customers of granting the credit shall be no greater than the rate impact such customers would have experienced had the Administrator been obligated to acquire resources in an amount equal to that actually produced by the resource for which the credit is granted." Because tiered rates require BPA to recover the full cost to BPA of serving incremental load from customers who take service under a Tier 2 rate, and to protect Tier 1 rates from such costs, the rate impact on Tier 1 customers of a Tier 2 sale is zero. Therefore, the rate impact test in section 6(h)(4) requires that the billing credit be no more than zero. Under section 6(h)(4), BPA could grant billing credits to a customer *only if* such billing credit had no rate impact on any other customer. Any billing credit greater than zero would raise Tier 1 rates and produce a greater rate impact on Tier 1

19

customers than would the Tier 2 sale. With tiered rates in effect then, the only billing credit that has no rate impact on other customers is zero.

In short, in a tiered rate environment in which BPA's Tier 2 rates protect other customers from rate impacts from BPA's resource acquisitions, the maximum billing credit BPA could offer a customer that had agreed to tiered rates is always zero.

Grays Harbor's argument is predicated on the unstated assumption that a billing credit of zero is functionally and legally different from no billing credit at all. As demonstrated, this assumption is flawed.

## IV.   A WAIVER OF THE RIGHT TO EXCHANGE NEW RESOURCE COSTS DOES NOT CONFLICT WITH ANY PURPOSE OR PROVISION OF THE NWPA.

Grays Harbor's contention that the limited waiver in section 12.2 of its Regional Dialogue Contract conflicts with section 5(c) of the NWPA is incorrect. As BPA points out in response to Grays Harbor, the residential exchange program established in section 5(c) of the NWPA was expected primarily, but not exclusively, to benefit residential customers of IOUs. BPA Br. at 63. The House Report cited by BPA, *id.*, further elaborates on what the section 5(c) exchange program was expected to achieve:

> [Section 5(c)] is not likely to result in parity in retail rates being paid by consumers of preference customers and consumers of investor-owned utilities, but it should equalize the wholesale costs of the

electric power with a resulting benefit [to] the investor-owned utilities customers.

HR 96-976, Part I, 96th Cong., 2nd Sess. at 60 (May 15, 1980).

The more complete history of the circumstances that gave rise to the NWPA contained in HR 96-976, Part II, 96th Cong., 2nd Sess. (Sept. 16, 1980) at pp. 29-32, makes clear that, starting around 1974, preference customers as well as IOUs were encouraged to develop resources to help alleviate the impending shortage of federal power.[6] Thus, when the NWPA was enacted in 1980, some preference customers had already committed to develop high-cost resources, which largely explains why preference customers as well as IOUs were permitted to participate in the residential exchange program.

BPA drafted the limitation on exchange privileges in Section 12.2 narrowly to protect the expectations and rights of preference customers. Section 12.2 refers to the Average System Cost (ASC)[7] Methodology,

_____

[6] An example of such resources is the Boardman Coal Plant. Construction of this resource began in 1976. When commercial operations commenced in August, 1980, the cost of power from this resource substantially exceeded BPA's then current preference customer rate.

[7] ASC is the starting point for calculating Residential Exchange benefits under Section 5(c) of the NWPA. The Residential Exchange provides for an exchange of power between BPA and its customers where BPA purchases the customer's power at that customer's ASC, and the customer purchases power from BPA at a lower "exchange" rate. The result is an exchange in which no power physically changes hands, but financial benefits are

21

which excludes resources dedicated to load after September 30, 2006, if the customer opts for tiered rates under a Regional Dialogue Contract. September 30, 2006, was selected as the cut off date because by that time all customers knew the broad outline of the Regional Dialogue plan and were on notice that resources dedicated later may be excluded from their ASCs.

Contrary to Grays Harbor's implicit claim (GH Br. at 39-40), the NWPA does not define "average system cost" of resources. Section 5(c)(7) of the NWPA expressly delegates to the Administrator the task of defining the average system cost of resources through a methodology to be approved by the Federal Energy Regulatory Commission (FERC). 16 U.S.C. § 839c(c)(7). As long as the methodology developed by BPA is consistent with the purposes of the NWPA and does not conflict with any of its express requirements, it must be upheld. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 476 U.S. 837 (1984). BPA has in fact modified its ASC Methodology to be consistent with tiered rates and with section 12.2 of the Regional Dialogue Contracts, and the new methodology has been approved by FERC. *Sales of Electric Power to the Bonneville Power Administration, Revisions to Average System Cost Methodology,* 128 FERC ¶ 61,222 (Sept.

---

provided to the customer that are measured by the difference between the customer's ASC and the BPA exchange rate. *See Portland Gen. Elec. Co. v. BPA,* 501 F.3d 1009, 1015 (9th Cir. 2007), *cert. denied,* 128 S.Ct. 2902 (2008).

4, 2009). In this case, Grays Harbor seeks to require BPA to calculate its average system cost of resources in direct conflict with the requirements of BPA's approved Methodology.

Thus, BPA's decision to condition its offer of a tiered-rate, Regional Dialogue Contract on the narrowly limited waiver in Section 12.2 is wholly consistent with the NWPA.

## V.   GRAYS HARBOR'S VOLUNTARY WAIVER OF RIGHTS IN ITS TIERED RATE CONTRACT IS CONSISTENT WITH THIS COURT'S DECISIONS IN *PORTLAND GENERAL ELECTRIC* AND *GOLDEN NORTHWEST ALUMINUM*

Grays Harbor contends (GH Br. at 31-33) that its voluntary waiver of rights related to billing credits and the Residential Exchange is inconsistent with this Court's decisions in *Portland Gen. Elec. Co. v. BPA,* 501 F.3d 1009, 1015 (9th Cir. 2007), *cert. denied,* 128 S.Ct. 2902 (2008) ("*PGE*"), and *Golden Northwest Aluminum Co. v. BPA,* 501 F.3d 1009, 1015 (9th Cir. 2007), *cert. denied,* 128 S.Ct. 2902 (2008) ("*GNA*"). This claim is without merit for two reasons.

First, as we have demonstrated above, Grays Harbor voluntarily waived its statutory rights in this case in order to obtain the considerable benefits of a Regional Dialogue Contract containing tiered rates. By contrast, in *PGE,* preference customers of BPA, including the Intervenor Preference Customers, vociferously objected to BPA's actions throughout

23

the agency proceedings at issue there. *PGE,* 501 F.3d at 1024-45. In fact, the Residential Exchange settlements challenged in *PGE* were between BPA and its non-preference investor-owned utility customers and not with its preference customers, so, unlike here, the waiver contained in the challenged settlements could not be ascribed to the preference customers. *Id.* at 1019-21.

Second, as also demonstrated above, the Regional Dialogue Contracts are consistent with both the billing credits and Residential Exchange provisions of the NWPA. In contrast, this Court rejected the Residential Exchange settlements challenged in *PGE* and *GNA* because BPA replaced the Residential Exchange mechanism prescribed by Congress in Section 5(c) of the NWPA with a different exchange mechanism in the settlements that conflicted with Sections 5(c) and 7(b)(2). *PGE,* 501 F.3d at 1025-36. This Court similarly rejected BPA's attempt to circumvent the rate protections afforded to preference customers from the costs of the Residential Exchange contained in NWPA Section 7(b)(2), concluding that BPA could not impose exchange costs above the 7(b)(2) rate cap on preference customers by simply relabeling such costs as "settlement costs." *GNA,* 501 F.3d at 1047-48.

In this case, BPA's decision to adopt Tiered Rates is consistent with the goals of the NWPA, and there is nothing in the Act that prohibits BPA

24

from adopting Tiered Rates or requiring participants who wish to receive

Tiered Rate Contracts to waive statutory rights that are inconsistent with

Tiered Rates.  Accordingly, BPA's actions here are consistent with the

NWPA and must be upheld by this Court.   As this Court found in *Ass'n of*

*Pub. Agency Customers v. BPA,* where the statute does not require BPA to

follow a particular course, BPA is free to adopt reasonable means at its

disposal to achieve the goals Congress has set forth in the statute.  126 F.3d

1158, 1169-71 (9th Cir. 1997).

### Conclusion

For the reasons stated herein, the Petition of Public Utility District No.

1 of Grays Harbor County, Washington, should be dismissed.

Dated:  December 15, 2009.

Respectfully submitted,

*/s/ Paul M. Murphy*
Paul M. Murphy, OSB #84125
MURPHY & BUCHAL, LLP
2000 SW First Ave., Suite 420
Portland, Oregon  97201
Tel:  (503) 227-1011
E-mail:  pmurphy@mbllp.com

*Attorney for Cowlitz PUD*

*/s/ Eric Christensen*
Anne L. Spangler, WSB # 22189
    General Counsel
Eric Lee Christensen, WSB # 27934

*/s/ Susan K. Ackerman*
Susan K. Ackerman, OSB #83183
621 SW Morrison, Suite 700
Portland, Oregon  97205
Tel: (503) 297-2392
E-mail:  susan@ska-law.com

*Attorney for Northwest Requirements
Utilities*

*/s/ R. Erick Johnson*
R. Erick Johnson, OSB #80062
R. ERICK JOHNSON PC
5285 SW Meadows Rd, Ste 230

Assistant General Counsel
Jeffrey R. Kallstrom, WSB # 37169
  Senior Counsel
Public Utility District No. 1
of Snohomish County, Washington
PO Box 1107
2320 California Street
Everett, WA 98206-1107
Telephone: (425) 783-8649
Email:  elchristensen@snopud.com

*Attorneys for Public Utility District
No.1 of Snohomish County,
Washington*

Lake Oswego, OR 97035
Tel: 503.684.9658
Fax: 503.968.6159
E-mail: ejohnson@rejpc.com

*Attorney for Pacific Northwest
Generating Cooperative and Members*

26

## CERTIFICATE OF COMPLIANCE

### Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rules 32-1 and 32-1

I certify pursuant to Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rules

32-1 and 32-1 that the foregoing brief is proportionately spaced, has a

typeface of 14 points, and contains 5,674 words.

DATED: December 15, 2009.

*/s/ Susan K. Ackerman*
Susan K. Ackerman OSB #831382

## STATEMENT OF RELATED CASES

Cowlitz PUD, Snohomish PUD, NRU and PNGC state that pursuant to Ninth Circuit Rule 28-2.6, this case is related to *Industrial Customers of Northwest Utilities, et al., v. BPA,* Consolidated Case Nos. 09-70290, 09-70390, and 09-70393. Those consolidated cases arise out of the same Regional Dialogue decisions which gave rise to the Regional Dialogue Contracts challenged in the petitions in this consolidated case.

DATED at Portland, Oregon this 15th day of December, 2009.


*/s/ Paul M Murphy*
Paul M. Murphy OSB #841250

*/s/ Susan K. Ackerman*
Susan K. Ackerman OSB #831382

*/s/ Eric Christensen*
Eric Christensen WSB # 27934

*/s/ R. Erick Johnson*
R. Erick Johnson OSB #80062

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2009, I electronically filed the foregoing RESPONDENT-INTERVENOR BRIEF OF PUBLIC UTLITY DISTRICT NO. 1 OF COWLITZ COUNTY, WASHINTON, NORTHWEST REQUIREMENTS UTILITIES, PUBLIC UTLITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINTON, AND PACIFIC NORTHWEST GENERATING COOPERATIVE AND MEMBERS with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

David Hill                                      Anne Spangler
DEPARTMENT OF ENERGY        PUD #1 of Snohomish County
1000 Independence Avenue, S.W.   PO Box 1107
Washington, DC 20585                 Everett, WA 98206-1107

Dated at Portland, Oregon this 15th day of December, 2009.

*/s/ Susan K. Ackerman*
Susan K. Ackerman, OSB #831832
Attorney for Northwest Requirements
Utilities