IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Consolidated Case Nos. 09-70265, 09-70268,
09-70292, 09-70313, 09-70316, 09-70317, and 09-70640

AVISTA CORPORATION, et al.,

*Petitioners*,

v.

BONNEVILLE POWER ADMINISTRATION,

*Respondent.*

On Petition for Review under the Northwest Power Act

**BRIEF OF INTERVENOR
PUBLIC POWER COUNCIL**

Mark R. Thompson
Public Power Council
825 NE Multnomah Street, Ste. 1225
Portland, Oregon 97232
Tel: 503.595.9779
Fax: 503.239.5959
E-mail: mthompson@ppcpdx.org

*Attorney for Public Power Council*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, PPC states as follows:

The Public Power Council is a non-profit corporation organized under the law of the State of Washington and it has no parent corporation and no publicly owned corporation owns any stock in it.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** .................................................... ii

**TABLE OF AUTHORITIES** .................................................................... v

**STATEMENT OF JURISDICTION** ......................................................... 1

**ISSUES PRESENTED FOR REVIEW** ..................................................... 1

**STATEMENT OF THE CASE** ................................................................. 2

**STATEMENT OF FACTS** ....................................................................... 4

**SUMMARY OF THE ARGUMENT** ......................................................... 6

**ARGUMENT** ......................................................................................... 8

**I.   STANDARD OF REVIEW** ............................................................... 8

**II.  THE IOUs' CLAIM THAT BPA VIOLATED RATEMAKING PROVISIONS OF THE NORTHWEST POWER ACT BY AGREEING TO PROVIDE ITS PREFERENCE CUSTOMERS WITH RECs IS NOT REVIEWABLE AT THIS TIME.** ................................................................. 9

    *A.  The IOUs Ask the Court to Find that Actions BPA Has Not Taken Are Unlawful.* ........................................................................................... 9

    *B.  The Administrative Record in this Case Appropriately Contains Nothing for the Court to Review on the Question of Whether or Not BPA Will Properly Implement the Residential Exchange Program in October of 2011.* ................... 13

    *C.  BPA's Brief Contains an Erroneous Assertion About a Provision in the Contracts that the Court Should Not Rely on in Its Opinion.* .............................. 14

**III.  EVEN IF THE IOUs' CLAIMS WERE RIPE FOR REVIEW, THOSE CLAIMS ARE GROUNDED ON AN ERRONEOUS ASSUMPTION THAT THE NORTHWEST POWER ACT DICTATES A PARTICULAR DISTRIBUTION OF ENVIRONMENTAL ATTRIBUTES.** ........................... 17

**IV.  BPA's DECISION TO TRANSFER RECs TO ITS PREFERENCE CUSTOMERS IS NOT ARBITRARY AND CAPRICIOUS.** ........................... 18

*A. The Various BPA Decisions on the Topic of Allocating RECs Are Entirely Consistent.* ........................................................................................19

*B. The IOUs Fail to Recognize that BPA's Preference Customers Pay the Full Costs of the Resources With Which the RECs Are Associated.*.............................23

**CONCLUSION**...........................................................................................**24**

**CERIFICATE OF COMPLIANCE** ................................................................**25**

**CERTIFICATE OF SERVICE** ......................................................................**26**

# TABLE OF AUTHORITIES

## Cases

*Aluminum Co. of Am. v. Bonneville Power Admin.*, 891 F.2d 748 (9th Cir. 1989)...8

*Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585 (9th Cir. 1990)...8

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir. 1997)................................................................................8

*CP Nat. Corp. v. Bonneville Power Admin.*, 928 F.2d 905 (9th Cir. 1991) .............6

*Envtl. Def. Ctr., Inc. v. Entl. Prot. Agency*, 344 F.3d 832 (9th Cir. 2003) ...............9

*In re Ownership of Renewable Energy Certificates*, 913 A.2d 825 (N.J. Super. Ct. 2007) ...............................................................................17

*Portland Gen. Elec. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007) ...6

*Texas v. United States*, 523 U.S. 296 (1998) ...........................................................11

*U.S. Postal Serv. v. Gregory*, 534 U.S. 1 (2001). .....................................................9

*Wheelabrator Lisbon Inc. v. Connecticut Dept. of Public Utility Control*, 526 F.Supp.2d 295 (D. Conn. 2006) .........................................................17

## Statutes

16 U.S.C. § 839c ......................................................................................10

16 U.S.C. § 839e ......................................................................................18

ORS § 469A.130(1) ..................................................................................17

RCW § 19.285.040(2)...............................................................................17

## Other Authorities

*In re American Ref-Fuel Co.,* 105 FERC ¶ 61,004 (2003) ......................................17

**Regulations**

*2007 Supplemental Wholesale Power Rate Adjustment Proceeding, Public Hearings, and Opportunities for Public Review and Comment*, 73 Fed. Reg. 7,539, 7,546 (Feb. 8, 2008) ..................................................................12

## STATEMENT OF JURISDICTION

Intervenor Public Power Council (PPC) adopts the statement of jurisdiction set out in pages 1 and 2 of the Answering Brief of Respondent Bonneville Power Administration (BPA).

## ISSUES PRESENTED FOR REVIEW

1. Whether the Investor-Owned Utilities' (IOUs') claims are ripe for review, where the IOUs argue that BPA's decision to allocate "Renewable Energy Certificates" to its preference customers is contrary to ratemaking provisions of the Northwest Power Act, and where BPA has made no decision regarding the ratemaking treatment of such Renewable Energy Certificates.

2. Assuming the IOUs' arguments are ripe for review, whether BPA violated any provision of the Northwest Power Act in determining that it would allocate Renewable Energy Certificates to its preference customers, who purchase the output of BPA's generation resources.

3. Whether BPA's actions were arbitrary and capricious where the agency determined that it could not quantify the precise future value, for ratemaking purposes, of Renewable Energy Certificates, but that it would allocate them to the purchasers of its power.

## STATEMENT OF THE CASE

In this case, certain Investor-Owned Utilities (IOUs) located in the Pacific Northwest challenge a determination by the Bonneville Power Administration (BPA) that it will transfer to its public-body utility customers ("preference customers") the documentation necessary for those customers to demonstrate that the power they purchase from BPA comes from electric generating resources with certain attributes. This documentation takes the form of "Renewable Energy Certificates" (or "RECs"), and demonstrates that preference customers are entitled to claim, as may be required under state law or local programs, the "Environmental Attributes" associated with those resources from which they purchase power. BPA's commitment to make this transfer of RECs appears in power sales contracts between BPA and its preference customers, which govern BPA service to those customers beginning October 2011.

The IOUs allege that in making this commitment to transfer RECs, BPA violated certain ratemaking provisions of the Northwest Power Act. However, to date, BPA has not begun a rate-making proceeding to establish rates for this time period, given that the service under these contracts is nearly two years away. Instead, BPA has offered the IOUs assurance that any concerns they have about the transfer of RECs to BPA's preference customers can be appropriately addressed in

the ratemaking proceedings where BPA will actually take the actions to which the IOUs' claims relate.

Like BPA, Intervenor Public Power Council (PPC)[1] asks the Court to find that the IOUs' claims are not ripe for review, because 1) BPA has not yet had an opportunity to consider the IOUs' suggestions in the proper forum, 2) BPA has not taken any of the actions the IOUs contend are unlawful, and 3) BPA has every opportunity and intention to set its rates in accordance with the statutory criteria on which the IOUs' claims are based. Furthermore, even if the IOUs' claims were ripe for review, their claims are based on their *notions* of what BPA should do in the future when setting rates, rather than any statutory directive or case law compelling the result they seek.

The IOUs also argue that BPA acted arbitrarily in violation of the Administrative Procedure Act ("APA"). This argument rests on the proposition that because the agency determined that there was insufficient information about the *value* of the RECs to guarantee the IOUs any particular future ratemaking result, it was unreasonable for the agency to determine that it could transfer the RECs to preference customers based on their purchase of BPA power. PPC asks the Court to find that BPA's actions are not arbitrary and capricious because there

---

[1] PPC's brief is adopted by reference in the brief of intervenor-respondents in this matter, Public Utility District No. 1 of Cowlitz County, Washington, Northwest Requirements Utilities, Public Utility District No. 1 of Snohomish County, Washington, and Pacific Northwest Generating Cooperative and Members.

is no contradiction, let alone reversible error, associated with BPA's explanations or actions.

## STATEMENT OF FACTS

The Public Power Council represents the interests of its members on power supply and transmission issues. All of PPC's members are public-body utilities that purchase wholesale power from the Bonneville Power Administration.

In the last part of 2008, BPA and all of its public-body utility customers, termed "preference customers," entered into long-term power sales contracts. A.R. 00001-4; S.E.R.[2] 001-4. These contracts had been negotiated over a long period leading up to their execution. Because of the long negotiations that preceded the contracts, and the region-wide input that led to their development, they have been termed "Regional Dialogue" contracts. The Regional Dialogue contracts govern power sales from BPA to its preference customers starting on October 1, 2011, and they run for twenty years past the date they were executed. A.R. 00007; S.E.R. 0007.

An exhibit (Exhibit H) of the contracts governs the allocation of Renewable Energy Certificates and Environmental Attributes associated with the federal generation resources whose output BPA markets. A.R. 00112; S.E.R. 0112. This

---

[2] All references to S.E.R. are to the Supplemental Excerpts of Record filed by BPA in this proceeding. Because PPC's brief refers only to documents contained in BPA's Excerpts of Record, PPC is not separately filing an excerpts of record.

exhibit was negotiated because it is important under state law, and for purposes of local programs administered by BPA's preference customers, that preference customers be able to demonstrate that the power they purchase from BPA in order to serve their end-use customers comes from resources that have certain attributes, such as being fueled by renewable resources or emitting no carbon. Because the resources from which BPA markets power are overwhelmingly non-carbon emitting resources, and because several of the resources currently qualify as "eligible renewable resources" under state renewable portfolio standards, it was important that preference customers ensure that they received the necessary documentation to demonstrate the source of the power they purchase from BPA under long-term contracts. PPC and BPA, along with many other utility representatives, worked to implement the straightforward and simple approach contained in the contracts for allowing preference customers to certify the source of their power purchases. *See* BPA Br., pp. 28-29. A.R. 0428-29; S.E.R. 0428-29.

Whereas the preference customers of BPA have a statutory right to purchase the power marketed by BPA on a priority basis, *see* 16 U.S.C. §§ 832c, 832d, 839c(a), 839c(b)(1), the Investor-Owned Utilities (IOUs) derive their primary benefit from BPA under statute in the form of receiving "Residential Exchange Program" benefits. These benefits are governed by sections 5(c) and 7(b)(2) of the Northwest Power Act, and take the form of financial payments to the IOUs from

BPA. *See CP Nat. Corp. v. Bonneville Power Admin.*, 928 F.2d 905, 907 (9th Cir. 1991) (explaining how the statutory program operates to provide a subsidy to the IOUs in the form of a cash payment); *Portland Gen. Elec. v. Bonneville Power Admin.*, 501 F.3d 1009, 1015 (9th Cir. 2007) (explaining mechanism through which payment is made and determined).

BPA determines the *amount* of its payments to the IOUs through implementing various ratemaking directives contained in the Northwest Power Act. Because the Regional Dialogue contracts do not govern BPA's electric power sales until October of 2011, BPA has not established its rates, or begun any proceeding to set rates for service during any part of the Regional Dialogue contracts' term.

In this case, the IOUs seek to convince the Court that BPA has taken some action that prejudices their benefits under the Residential Exchange Program by allocating RECs and Environmental Attributes to its preference customers who purchase the power from its resources.

## SUMMARY OF THE ARGUMENT

The IOUs' claims in this case ultimately rest upon the proposition that BPA has violated ratemaking provisions of the Northwest Power Act by agreeing to transfer RECs to its preference customers as laid out in the Regional Dialogue

contracts. These claims are not ripe for adjudication, however, because BPA has not yet set rates for the period governed by the term of the Regional Dialogue contracts, and has therefore not had the opportunity to determine how it will implement the ratemaking provisions that the IOUs argue BPA violated. For the Court to adjudicate the IOUs' claims, it would have to presume certain actions by BPA that the agency may not even take. Additionally, it would have to assume, erroneously, that the REC-related provisions of the Regional Dialogue contracts are not able to be squared with the ratemaking provisions of the Northwest Power Act.

To the extent the IOUs' claims are ripe for adjudication, the Court should dismiss those claims because they ask the Court to read into the Northwest Power Act a requirement about how the value of RECs should be distributed that does not exist within that Act. Nothing in the Northwest Power Act establishes a right of the IOUs to receive RECs, which only have relevance under state law and local programs.

The IOUs' claims that BPA violated the Administrative Procedure Act by acting in an arbitrary and capricious manner in distributing RECs under the Regional Dialogue contracts also fail. In making the argument that BPA violated the APA, the IOUs attempt to make certain determinations by BPA appear

inconsistent with each other, when those determinations are in fact consistent, reasonable, and supported.

## ARGUMENT

### I. STANDARD OF REVIEW

In reviewing actions of the BPA under the Northwest Power Act, the Court affirms BPA's actions unless they are "arbitrary, capricious, an abuse of discretion, or in excess of statutory authority." *Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989). The Court has explained that when reviewing a challenge to an agency's statutory authority, "[its] inquiry must begin . . . by examining the statutory language." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1169 (9th Cir. 1997).

If Congress has spoken directly to the issue, so that there is a clearly expressed intent, then the Court "reject[s] administrative constructions of a statute that are inconsistent with the statutory mandate or that frustrate the policy Congress sought to implement." *Aluminum Co. of Am. v. Bonneville Power Admin.*, 891 F.2d 748, 752 (9th Cir. 1989). On the other hand, when the relevant statute is silent on the salient question, the Court assumes that Congress has implicitly left a void for BPA to fill, and, therefore, the Court will "defer to the agency's construction of its governing statutes, unless that construction is unreasonable." *Ass'n of Pub. Agency Customers*, 126 F.3d at 1169.

8

In conducting its review under the "arbitrary and capricious" standard of the Administrative Procedure Act, the Court will not substitute its judgment for that of the agency. *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 6-7 (2001). Rather, it affirms the agency action if the agency has articulated a rational connection between the facts found and the conclusions it has made. *Envtl. Def. Ctr., Inc. v. Envtl. Prot. Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004).

## II. THE IOUs' CLAIM THAT BPA VIOLATED RATEMAKING PROVISIONS OF THE NORTHWEST POWER ACT BY AGREEING TO PROVIDE ITS PREFERENCE CUSTOMERS WITH RECs IS NOT REVIEWABLE AT THIS TIME.

PPC agrees with and supports BPA's argument set forth in its Answering Brief that the IOUs' claims in this case that BPA violated ratemaking provisions of the Northwest Power Act are not reviewable. Those claims are not ripe, and BPA has taken no action, let alone final action, to implement the ratemaking directives of the Northwest Power Act in the context of determining how to treat the value, if any, of the RECs or Environmental Attributes associated with its resources that are allocated under the Regional Dialogue contracts.

### A. The IOUs Ask the Court to Find that Actions BPA Has Not Taken Are Unlawful.

As stated by BPA, the IOUs' ratemaking claims in this case revolve solely around whether BPA is properly implementing the Residential Exchange Program

set out in section 5(c) of the Northwest Power Act, 16 U.S.C. § 839c(c). *See* IOU Br., pp. 7-8 (arguing that section 7(b)(1) contains rate-setting directives that bear on the Residential Exchange Program and that are violated because of the contractual provision regarding RECs); *id*. p. 9 (arguing that section 7(f) contains Residential Exchange Program-related rate directives that BPA has violated by allocating RECs to preference customers); *id*. p. 24 (arguing that BPA's transfer of RECs violates ratemaking provisions found in section 7(g) of the Northwest Power Act, and which govern how BPA sets the rates that determine Residential Exchange Program benefits).

However, fatal to the IOUs' ability to bring these claims to the Court in this case are the following facts:

1) The contractual provision that is challenged by the IOUs governs BPA power service deliveries starting in October 2011;

2) BPA has not yet established rates, or even begun the process to set rates for the period starting October 2011; and

3) The contractual provision being challenged by the IOUs does not determine how BPA will set rates to account for the value or costs, if any, of RECs or Environmental Attributes.

Furthermore, Exhibit H of the Regional Dialogue contracts specifically states that BPA reserves all of its ratemaking authorities "[n]otwithstanding the transfer, sharing, management, conveyance, marketing or crediting of RECs . . . pursuant to [the contract]." A.R. 0115; S.E.R. 0115. In short, by asking the Court to

determine that BPA has violated ratemaking directives in the Northwest Power Act, the IOUs are asking the Court to review decisions the agency has yet to make. Additionally, they ask the Court to presume that BPA will make those decisions in a way that the IOUs believe violates the law.

These claims are not ripe for review by this Court because they "rest[] upon contingent future events that may not occur as anticipated [by the IOUs], or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-81 (1985) (quotations omitted). That the IOUs' arguments presented to the Court are premature is demonstrated by the fact that their Opening Brief could properly be submitted almost "as is" to BPA in a future rate proceeding. For example, the IOUs argue in their brief to the Court that "[b]ecause both the PF Preference rate and the PF Exchange rate bear the costs of resources giving rise to Environmental Attributes, both such rates should equitably share in the benefits of the Environmental Attributes that are produced by such resources." IOU Br., p. 25. It is the primary purpose of BPA *rate proceedings* to allow the agency to consider and respond to these very types of arguments.

For example, in BPA's most recent rate-setting proceeding, the agency considered, in accordance with its established rate case procedures, all parties' arguments concerning how the PF Exchange rate should be set, including

11

arguments about equitable concerns. *See*, *e.g., 2007 Supplemental Wholesale Power Rate Adjustment Proceeding, Public Hearings, and Opportunities for Public Review and Comment*, 73 Fed. Reg. 7,539, 7,546 (Feb. 8, 2008) (establishing that one purpose of BPA's rate proceeding was to allow parties to submit legal and policy argument and evidentiary support concerning how BPA should establish the PF Exchange rate). If the IOUs want to argue that the PF Exchange rate should "equitably share in the benefits of the Environmental Attributes," they must first make that argument to BPA in the relevant rate-setting proceeding—not in filings to this Court.

In a secondary effort to paint their argument as a challenge to some action of BPA other than a yet-to-be made ratemaking decision, the IOUs try to finesse their case into a challenge to some unlawful *inaction* of BPA. Specifically, they claim that "BPA's *failure to allocate* a share of the Environmental Attributes to investor-owned utilities that participate in the Residential Exchange Program violates the Northwest Power Act." IOU Br., p. 21. What the IOUs fail to recognize is that even if one assumed that BPA must allocate some "share" of Environmental Attributes to the IOUs, the only context in which BPA could make such an allocation would be through determining their Residential Exchange Program

benefits—a determination that is made in the context of rate-setting for the period starting in October of 2011.[3]

> **B. The Administrative Record In This Case Appropriately Contains Nothing for the Court to Review on the Question of Whether or Not BPA Will Properly Implement the Residential Exchange Program in October of 2011.**

As described above, the IOUs ask the Court to determine that the Regional Dialogue contracts' provisions concerning RECs amount to an unlawful implementation of (or frustration of) the ratemaking provisions of the Northwest Power Act. If the Court were to accept the IOUs' invitation, it would find that the Administrative Record in this case gives the Court nothing on which to base an analysis of that claim. This is not because of any defect in the Administrative Record. Rather, it is because the Administrative Record in this proceeding depicts the record that was before the BPA Administrator at the time he made the decision to execute the Regional Dialogue contracts. It does not contain information or argument that was before the Administrator at the time he determined how to implement the Residential Exchange Program in October of 2011 because that decision has not yet been made.

---

[3] Although the IOUs' entitlement to participate in the Residential Exchange Program may be memorialized in their Residential Purchase and Sale Agreements ("RPSA") with BPA, those agreements do not determine the value or quantity of benefits that will be received, and therefore could not embody an allocation of Environmental Attributes or RECs to the IOUs. *See* pp. 20-21 of this brief.

At the very least, in order for the Court to determine in this proceeding whether the IOUs' claims have merit, or are even factually correct, the Court would have to determine:

- The "value" of the RECs in each of the states where the IOUs and preference customers operate in 2011 (in order to determine that the RECs have a cognizable value that must be taken into account in determining the IOUs' Residential Exchange Benefits);

- The regulatory structure, if any, associated with RECs in each state in 2011 (in order to determine whether the IOUs have any cognizable interest in RECs);

- Whether BPA will determine in its rate case for the period starting in October 2011 that it will recognize a certain monetary value associated with RECs (in order to determine whether BPA's ratemaking decisions are reasonable); and

- Whether each of the individual IOUs will actually be eligible to receive any Residential Exchange Benefits in the years following October 2011 (in order to determine whether the IOUs have any actual injury associated with BPA's implementation of the Residential Exchange Program).

The fact that this information cannot reasonably be known or projected until BPA completes its rate-setting process for the period after the start of the Regional Dialogue contracts is reason in and of itself for the Court to withhold review of the IOUs' claims in this case.

### C. BPA's Brief Contains an Erroneous Assertion About a Provision in the Contracts That The Court Should Not Rely on in Its Opinion.

As described above, PPC agrees with BPA's position that the IOUs' claims about ratemaking provisions and the allocation of RECs are not ripe for review.

By way of correction, however, and in order to prevent the Court from needlessly relying on an improper interpretation of the Regional Dialogue contracts, PPC points out a misstatement contained in BPA's brief.

On pages 72-73 of its Answering Brief, BPA correctly points out that Exhibit H of the Regional Dialogue contracts expressly states that BPA is reserving its ratemaking authority to determine whether and how it will factor into its rates for the Residential Exchange Program "a share of the value . . . of any or all of the RECs and Carbon Credits." BPA further points out that this provision was put into the contracts specifically to address the IOUs' concerns that are presented in this case.

Although BPA is correct that the contracts reserve BPA's ratemaking authority and that this demonstrates the lack of merit of the IOUs claims of injury, BPA's brief then goes on to mischaracterize the relevant contractual provision. Specifically, BPA's brief states,

> Thus, section 9 reflects the express acknowledgement *of BPA's preference customers* that BPA may use its ratemaking authority to address issues associated with Environmental Attributes and the calculation of the PF Exchange rate which could, in turn, affect the preference customers' rates.

BPA Br., p. 73 (emphasis added).

This statement is incorrect because section 9 reflects *BPA's* express reservation of *its* authorities—not an express acknowledgement by preference customers of any particular result of BPA's implementation of its ratemaking

authority. PPC does not necessarily disagree with BPA's statement of the *potential* consequences of BPA's exercising of its ratemaking authority. However, it is improper to characterize the relevant reservation of authority *by BPA* as an express acknowledgment by the preference customers about how BPA may use that authority.

Although the distinction the PPC seeks to make likely is of little or no consequence in this case, we point it out in this brief simply to avoid the Court inadvertently stating in its Opinion that the *preference customers* have expressly acknowledged any given effect of BPA's ratemaking authority. Any effect of BPA's ratemaking authority should be determined in the first instance by BPA in a fully developed rate proceeding. In other words, just as the IOUs must wait to make their rate-making arguments to BPA, the preference customers still have the right to make their rate-making arguments to BPA in a rate case. BPA's reservation of its authority to make those decisions should not be confused with a contractual acknowledgement by preference customers of how BPA may use those authorities.

### III. EVEN IF THE IOUs' CLAIMS WERE RIPE FOR REVIEW, THOSE CLAIMS ARE GROUNDED ON AN ERRONEOUS ASSUMPTION THAT THE NORTHWEST POWER ACT DICTATES A PARTICULAR DISTRIBUTION OF ENVIRONMENTAL ATTRIBUTES.

The IOUs argue that they are entitled to a "fair share" of the Environmental Attributes associated with the federal system. IOU Br., p. 31. However, the IOUs cannot point to any provision of the Northwest Power Act that dictates such a rule or defines their claimed "fair share." This is not surprising, since these attributes did not exist in 1980, when the Northwest Power Act was enacted. Rather, Renewable Energy Certificates are relatively new market and regulatory concepts created by state law. *See In re Ownership of Renewable Energy Certificates*, 913 A.2d 825, 830 (N.J. Super. Ct. 2007) (stating that Renewable Energy Certificates are "state creations"); *Wheelabrator Lisbon Inc. v. Connecticut Dept. of Public Utility Control*, 526 F. Supp. 2d 295, 307 (D. Conn. 2006) (finding that RECs "are creations of state legislation and regulation"); *In re American Ref-Fuel Co.,* 105 FERC ¶ 61,004, par. 23 (2003) ("RECs are created by the States."). RECs are primarily used to satisfy state-mandated renewable energy requirements. *See*, *e.g.*, RCW § 19.285.040(2) (allowing utilities to acquire RECs as one means of meeting Washington state's renewable energy targets); ORS § 469A.130(1) (permitting the use of RECs to establish compliance with Oregon's renewable portfolio standard).

As such, federal law has not explicitly directed BPA to distribute RECs or Environmental Attributes in any particular manner.

Recognizing they cannot claim a right to actual ownership of the RECs or Environmental Attributes, the IOUs assert that they are entitled to a share of their "value." *See*, *e.g.*, IOU Br., p. 21. Even if the IOUs are correct that they are entitled to a share of the value of the Environmental Attributes, a point that PPC does not concede, the distribution of the Environmental Attributes or RECs themselves would not differ from that laid out in the contracts. Rather, this "value" will be apportioned in the appropriate BPA rate proceeding. *See* 16 U.S.C. § 839e(i) (stating that a "full and complete record" will be developed and will form the basis of BPA's rate decision). As described in BPA's brief and Section II of this brief, BPA has not yet conducted the rate proceeding that will directly address this issue. *See* BPA Br., pp. 75-76.

## IV. BPA's DECISION TO TRANSFER RECs TO ITS PREFERENCE CUSTOMERS IS NOT ARBITRARY AND CAPRICIOUS.

The IOUs argue that BPA's decision to transfer the RECs associated with its generating resources to the preference customers who purchase power from those resources is arbitrary and capricious, and therefore should be set aside under the Administrative Procedure Act. IOU Br., pp. 26-33. The foundation of the IOUs' argument is their claim that BPA "failed to provide any reasoned explanation for

18

making diametrically opposite determinations [on the topic] in the space of less than two months." *Id*., p. 19. In making this assertion, the IOUs either fail to understand BPA's decisions, or they seek to persuade the Court that BPA made some decision it in fact did not make.

    A. *The Various BPA Decisions on the Topic of Allocating RECs Are Entirely Consistent.*

In alleging that BPA made "diametrically opposite determinations" without adequate explanation, the IOUs point to the following BPA determinations:

1) BPA's September 2008 decision that it could not guarantee any future ratemaking treatment to the IOUs related to RECs or Environmental Attributes; and

2) BPA's October 2008 decision in its Regional Dialogue Contract ROD that it would transfer RECs to its preference customers, based on the amount of power they purchase from BPA.

IOU Br., p. 27. The IOUs claim that "in the second instance, BPA determined to make such a transfer [to the preference customers] without explanation or any indication that it had any information that was not available to it when it made its first determination." IOU Br., p. 27.

The IOUs' argument pre-supposes that when it comes to determining how to allocate RECs, the IOUs must be viewed as precisely in the same situation as the preference customers. This argument falls flat when one considers the most obvious difference between the two groups: the preference customers purchase the

19

actual power that is produced by the resources associated with the RECs, whereas the IOUs' claim of benefits from BPA flow from the monetary subsidy component of the Residential Exchange Program. On that distinction alone, BPA's actions have a rational basis, as BPA properly explained. *See* A.R. 00428-29; S.E.R. 0428-29 (explaining that BPA agrees with its preference customers that "because preference customers who enter into [Regional Dialogue] contracts will be purchasing power from BPA which may have certain RECs and Carbon Credits associated with it, it is reasonable to transfer the rights to such RECs and Carbon Credits to [Regional Dialogue] contract holders along with the power they purchase").

The IOUs' argument that BPA acted inconsistently and unreasonably when it determined not to transfer any RECs to the IOUs also falls flat upon review of BPA's actual determination. The IOUs' point to BPA's statements in its record of decision regarding the IOUs' Residential Purchase and Sale Agreement (RPSA)— the agreement that the IOUs sign to show that they want to *participate in* the Residential Exchange Program (not a contract that establishes what their benefits will be in any future period). IOU Br., pp. 28-29. In the RPSA record of decision, BPA responded to the IOUs' claim that the IOUs are entitled to an "equitable share" of the value of RECs and Environmental Attributes. BPA explained that at that time it lacked sufficient information to determine how RECs would be valued

in the future, and how that valuation would affect the *Residential Exchange Program*. A.R. 00784; S.E.R. 0532.

Furthermore, BPA clearly explained that the IOUs' concerns could not be addressed in the context of the RPSA because the RPSA provides no determination about the actual level of any future Residential Exchange Program benefits, and because the IOUs would realize the benefits, if any, associated with RECs through implementation of the Residential Exchange Program. BPA stated,

> The proposed RPSA did not address this issue because there is insufficient information currently available upon which BPA can make a final decision regarding the *REP treatment* of Renewable Energy Certificates, carbon credits or Environmental Attributes in general. * * * BPA recognizes that the IOUs have concerns over BPA's treatment of Environmental Attributes . . . *However, BPA cannot address those concerns in this ROD*. . . These markets are still evolving, and there is insufficient information available upon which BPA can make a final decision regarding the *REP treatment* of Renewable Energy Certificates, carbon credits, or Environmental Attributes in general. Second, even if BPA were prepared to make a definitive statement on the disposition of Environmental Attributes, Renewable Energy Certificates or carbon credits, BPA would not make that decision in this ROD. The purpose of the RPSA is to establish the *mechanism* by which to pay REP benefits to exchanging utilities. Consequently, the issues that must be addressed in this ROD are limited to matters that directly relate to the *distribution* of REP benefits. The concerns raised by the IOUs as to how BPA will use the Environmental Attributes, Renewable Energy Credits, or carbon credits of the Federal system go beyond the issues BPA must or can address through the RPSA.

A.R. 00784; S.E.R. 0532 (emphasis added).

The IOUs claim that BPA's decision amounts to a final determination to deny them any value associated with RECs. IOU Br., pp. 1-2. This is incorrect.

BPA simply determined that any allocation to the IOUs could not be embodied in their RPSA contracts and would instead have to be accomplished when BPA actually set rates in the future to determine benefits under the Residential Exchange Program. BPA also fully explained why the IOUs could not have reasonably expected that they would receive an "allocation" of RECs in their RPSA contracts. *Compare* IOU Br., p. 19 (claiming that BPA's decision was arbitrary and capricious when "BPA refused to transfer any Environmental Attributes to PF Exchange range [*sic*] customers in their long-term RPSAs").

Furthermore, there is no connection between BPA's ability to decide the precise *Residential Exchange Program treatment* RECs will receive in the future and BPA's ability to decide that it will take the steps to transfer RECs to its *power purchasers*. In other words, contrary to the IOUs' assertions (IOU Br., p. 29), there is no reason BPA needed more clarity about the *Residential Exchange Program treatment* of RECs in some future period before it could properly decide to transfer RECs to its preference customers, who actually purchase power from BPA and may be required under state law to demonstrate that they purchase power from environmentally benign resources.

In sum, nothing in BPA's decisions regarding the allocation of RECs is even inconsistent, let alone arbitrary and capricious.

### B. The IOUs Fail to Recognize That BPA's Preference Customers Pay the Full Costs of the Resources With Which the RECs Are Associated.

The IOUs repeatedly assert that the preference customers are getting "something for nothing" by receiving the RECs associated with BPA's resources. *See, e.g.* IOU Br., p. 1 ("BPA imposed no additional charge for the Environmental Attributes."); *id.* p. 7 ("Nevertheless, BPA has decided to transfer Environmental Attributes solely to preference customers—and at no additional charge."); *id.* p. 14 ("The Regional Dialogue Contract ROD did not address why BPA decided to provide Environmental Attributes solely to preference customers and did not address why BPA decided to provide them at no additional charge.").

What the IOUs fail to explain is that the preference customers bear all of the costs of the resources from which they receive power.[4]  It would thus make little sense for BPA to charge the preference customers the full cost of those resources *plus* some "market value" of "green attributes" associated with those resources.  If BPA did so, it would then have to simply credit preference customers their own payments of such market value.  It was to avoid precisely this absurd result that the Regional Dialogue contract was negotiated to include the transfer of RECs along with the power at no *additional* cost.  This was explained thoroughly in BPA's Regional Dialogue Contract record of decision.  *See, e.g.,* A.R. 00429; S.E.R. 0429

---

[4] Although the IOUs often claim to "bear the costs" of the resources, they never bear any cost of the resources other than through the costs affecting the amount of *subsidy they receive* from BPA under the Residential Exchange Program.

("PPC proposed that preference customers would not pay any additional premium for those attributes because, PPC suggests, the costs of those attributes are already included in the costs of the resources that are accounted for in rates. . . . BPA largely agrees with PPC's proposal concerning RECs.").

In short, the IOUs' assertion that the preference customers received some free gift from BPA is simply wrong.  And, to the extent the IOUs argue that BPA failed to explain why it was not charging the preference customers some artificial "premium" for the RECs, that argument is contrary to the plain record in this case.

## CONCLUSION

For all of the above-stated reasons, the Court should dismiss the IOUs' arguments in this case.

Respectfully submitted this 15th day of December 2009.

 /s/ Mark R. Thompson
Mark R. Thompson, OSB # 044334
Public Power Council
825 NE Multnomah Street, Ste. 1225
Portland, Oregon 97232
Tel: 503.595.9779
Fax: 503.239.5959
E-mail: mthompson@ppcpdx.org
Attorney for Public Power Council

**CERIFICATE OF COMPLIANCE
PURSUANT TO FRAP 32(a)(7)(C) AND CIRCUIT RULE 32-1**


I certify that pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule

32-1, the attached opening brief is proportionately spaced, has a typeface of 14

points or more and contains 5,964 words.

Dated this 15th day of December 2009.


 */s/ Mark R. Thompson*
Mark R. Thompson, OSB # 044334
Public Power Council
825 NE Multnomah Street, Ste. 1225
Portland, Oregon 97232
Tel: 503.595.5779
Fax: 503.239.5959
E-mail: mthompson@ppcpdx.org

*Attorney for Public Power Council*

## STATEMENT OF RELATED CASES

The Public Power Council is not aware of any case pending in this Court

that is related to this case, as described in 9th Cir. R. 28-2.6.

 */s/ Mark R. Thompson*
Mark R. Thompson, OSB # 044334
Public Power Council
825 NE Multnomah Street, Ste. 1225
Portland, Oregon 97232
Tel: 503.595.5779
Fax: 503.239.5959
E-mail: mthompson@ppcpdx.org

*Attorney for Public Power Council*

26

# CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2009, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

David Hill
DEPARTMENT OF ENERGY
1000 Independence Avenue, S.W.
Washington, DC 20585

Thomas Aquinas Carr
Seattle City Attorney's Office
10th Floor
P.O. Box 94769
Seattle, WA 98124

Anne L. Spangler
Public Utility District No. 1 of Snohomish County, Washington
2320 California Street
Everett, WA 98201

Dated: December 15, 2009

By: */s/ Mark R. Thompson*

27